# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| URBAN MCCONNELL,                )<br>                                                        )<br>                        Plaintiff,         )<br>                                                        )          2:12-cv-01601-RCJ-PAL<br>        vs.                                        )<br>                                                        )<br>WAL-MART STORES, INC.,         )          **ORDER**<br>                                                        )<br>                        Defendant.      )<br>_____)| |

This is a slip-and-fall case. Pending before the Court are two Motions in Limine (ECF Nos. 47, 48). For the reasons given herein, the Court grants the motions in part and denies them in part.

## I.   FACTS AND PROCEDURAL HISTORY

On or about December 10, 2010, Plaintiff Urban McConnell slipped, fell, and injured himself at the Wal-Mart store at 8060 W. Tropical Pkwy., Las Vegas, Nevada after an employee mopped the floor and left water thereupon without blocking access to the area or warning customers. (Compl. ¶¶ 5–9, Aug. 7, 2012, ECF No. 1-2). Defendant removed and moved for summary judgment as against the claim for punitive damages. Plaintiff stipulated to dismiss the prayer for punitive damages, and the Court therefore denied the motion as moot, noting that it would have been inclined to grant it. A jury trial is set for February 18, 2014 in Las Vegas. Defendant has now filed two motions in limine.

## II.   LEGAL STANDARDS

A motion in limine is a procedural device to obtain an early and preliminary ruling on the

admissibility of evidence.  Black's Law Dictionary defines it as "[a] pretrial request that certain inadmissible evidence not be referred to or offered at trial.  Typically, a party makes this motion when it believes that mere mention of the evidence during trial would be highly prejudicial and could not be remedied by an instruction to disregard." *Black's Law Dictionary* 1109 (9th ed. 2009).  Although the Federal Rules of Evidence do not explicitly authorize a motion in limine, the Supreme Court has held that trial judges are authorized to rule on motions in limine pursuant to their authority to manage trials. *See Luce v. United States*, 469 U.S. 38, 41 n.4 (1984) (citing Fed. R. Evid. 103(c) (providing that trial should be conducted so as to "prevent inadmissible evidence from being suggested to the jury by any means")).

Judges have broad discretion when ruling on motions in limine. *See Jenkins v. Chrysler Motors Corp.*, 316 F.3d 663, 664 (7th Cir. 2002).  However, a motion in limine should not be used to resolve factual disputes or weigh evidence. *See C&E Servs., Inc., v. Ashland, Inc.*, 539 F. Supp. 2d 316, 323 (D.D.C. 2008).  To exclude evidence on a motion in limine "the evidence must be inadmissible on all potential grounds." *E.g.*, *Ind. Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004).  "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Hawthorne Partners v. AT&T Tech., Inc.*, 831 F. Supp. 1398, 1400 (N.D. Ill. 1993).  This is because although rulings on motions in limine may save "time, costs, effort and preparation, a court is almost always better situated during the actual trial to assess the value and utility of evidence." *Wilkins v. Kmart Corp.*, 487 F. Supp. 2d 1216, 1219 (D. Kan. 2007).

In limine rulings are preliminary and therefore "are not binding on the trial judge [who] may always change his mind during the course of a trial." *Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000); *accord Luce*, 469 U.S. at 41 (noting that in limine rulings are always subject to change, especially if the evidence unfolds in an unanticipated manner).  "Denial of a motion in

limine does not necessarily mean that all evidence contemplated by the motion will be admitted to trial.  Denial merely means that without the context of trial, the court is unable to determine whether the evidence in question should be excluded." *Ind. Ins. Co.*, 326 F. Supp. 2d at 846.

## II.   ANALYSIS

### A.   Motion No. 47

Defendant seeks to exclude Plaintiff's proffered expert, John Peterson, because he is not qualified as an expert and because his testimony will be irrelevant.  Mr. Peterson is offered as an expert in the area of the standard of care.  Mr. Peterson's curriculum vitae indicates that his area of expertise is better described as loss (theft) prevention.  In response, Plaintiff argues that Mr. Peterson is an expert in the area of retail safety and that his proffered testimony satisfies Rule 702 under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) because it is based upon his personal knowledge and experience.  Plaintiff admits that Mr. Peterson has no formal education in the area of safety but argues that his experience qualifies him as an expert under Rule 702.  As a rebuttal to Defendant's argument that Mr. Peterson has previously been rejected as an expert in the present context in Nevada state court, Plaintiff adduces as Exhibits 1 and 2 copies of orders: (1) denying a motion in limine to exclude Mr. Peterson as an expert in Arizona state court; and (2) accepting Mr. Peterson as an expert in retail safety in a case in this District.  Plaintiff also adduces as Exhibit 3 Mr. Peterson's report itself, which includes a list of his qualifications.  The fact that Mr. Peterson has been accepted as an expert by some judges and rejected by others indicates that the question of his expertise in the present context is a close one, and the Court also notes that copies of orders denying the preliminary exclusion of Mr. Peterson's proffered expert testimony are no evidence of his ultimate admission as an expert at trial.  Although Plaintiff argues that Mr. Peterson received some safety-related training at Wal-Mart and even provided the training to other employees, it is not clear whether this kind of training was a significant portion of Mr. Peterson's duties at Wal-Mart, or if it was simply

incidental to his employment, i.e., such as anti-discrimination or first-aid training all employees at a company might receive from their employer. Plaintiff does not appear to claim that Mr. Peterson ever held a title such as "Safety Officer," but does appear to claim that as a loss prevention officer, part of his formal duties included customer safety. It is simply not clear at this time whether Mr. Peterson's experience in the retail industry includes significant or only incidental knowledge of safety procedures. The Court would therefore normally not exclude an expert whose qualifications were simply doubtful at this stage, but would require the relevant party to show that he is qualified as an expert at trial.

However, in the present case, even assuming Mr. Peterson were qualified as an expert, his testimony would largely be more confusing than helpful to the jury. The Court will of course instruct the jury on the standard of care, and it is for the jury to consider whether Defendant acted reasonably. Only if the case concerned a heightened, particularized standard of care, such as in a professional malpractice case, would expert testimony as to the standard of care be more helpful than confusing to the jury. Only in such cases does a jury require expert testimony as to what constitutes reasonable behavior. A layman may evaluate reasonable behavior in the context of everyday events, such as mopping a floor in a retail store, without resort to expert assistance. Finally, whether Defendant adhered to its own policies—apparently another area in which Mr. Peterson would testify—is simply not relevant to whether it was negligent in this case. Adherence to insufficient policies will not exculpate a negligent defendant any more than non-adherence to sufficient policies will inculpate him. Whether a defendant's actions in a particular instance are negligent does not at all depend upon his habits or personal guidelines for his own behavior. Mr. Peterson may testify as to industry standards if the Court finds him qualified as an expert in this area at trial, but testimony concerning the general standard of care would be more confusing than helpful to the jury, and testimony concerning Wal-Mart's own policies and whether Defendant's employees adhered to them in this case would be irrelevant.

  **B.**  **Motion No. 48**

   **1.**  **The Collateral Source Rule and "Write-Downs"**

  Defendant asks the Court to exclude evidence of medical bills that have been partially or totally forgiven by Plaintiff's providers, i.e., "write-downs." Defendant argues that the collateral source rule does not apply to write-downs, because they do not represent money that anybody has paid. The Court denies the motion in this regard.

  The Nevada Supreme Court does not permit the admission of evidence of collateral sources of payment for any purpose whatsoever. *Proctor v. Castelletti*, 911 P.2d 853, 854 (Nev.1996) ("We now adopt a *per se* rule barring the admission of a collateral source of payment for an injury into evidence for *any* purpose." (emphases added)). The collateral source rule makes the tortfeasor liable for the full extent of the damages caused, no matter how much the victim actually pays. That a medical provider ultimately accepts less than a billed amount, whether from an insurance company or from the victim directly, is not relevant to whether the tortfeasor is liable for the full value of the harm he has caused. The collateral source rule is an equitable rule specifically designed to ensure that the victim, and not the tortfeasor, benefits from any "windfall" resulting from a difference between the value of the harm caused and the amount actually paid to remedy it. If a victim can remedy his harm at a "bargain" rate, the "windfall" represented by the difference belongs to the victim, not to the tortfeasor.

  As controversial as the collateral source rule is, whether the rule should apply to "write-downs" is even more so. This court has ruled before that there is no principled reason to distinguish a "bargain" obtained by virtue of the fact that an insurer rather than a victim pays a bill from a "bargain" obtained by virtue of the fact that a medical provider accepts partial payment (from the victim or the insurer) in satisfaction of the bill, i.e., a "write-down." In both cases, the victim may recover from the tortfeasor a verdict beyond his actual expenses.

  Defendant's citations to *Tri-County Equip. & Leasing, LLC v. Klinke* are not availing.

*Klinke* was a statutory interpretation case concerning whether a Nevada statute permitting the admission of workers compensation payments, but also mandating that a jury be instructed not to count those payments against a plaintiff's verdict, applies to payments made by out-of-state workers compensation systems (it does). *See* 286 P.3d 593, 595–96 (Nev. 2012). The *Klinke* Court ruled that because the admission of collateral workers compensation payments is permitted, and because the amount of such payments "necessarily incorporates" any write-downs, the Court did not need to consider any general exception to the collateral source rule for write-downs. *See id.* at 596. In other words, the relevant workers compensation statute in *Klinke* explicitly permitted the admission of evidence of collateral payments from workers compensation systems and therefore necessarily permitted the admission of the fact of any write-downs, because payments are of course made after any write-downs are applied. But the outcome depended purely upon a workers compensation statute that does not apply in general tort cases such as the present one. Therefore, the language of *Proctor* remains intact after *Klinke*: not admissible "for any purpose." *Proctor*, 911 P.2d at 854.

The question remains whether a write-down is a "payment" as contemplated under *Proctor*. The Court believes that it is. A creditor's forgiveness of debt—that is what a write-down in the present context amounts to—is often considered equivalent to payment in other contexts, e.g., income tax, credit bids at foreclosure, etc. In other words, a creditor's partial forgiveness of a tort victim's medical bills via a write-down is properly considered a third-party "payment," evidence of which is barred by the collateral source rule. The Court rejects the *Howell* Court's rationale that a write-down is not equivalent to forgiveness of debt because write-downs are prearranged between insurers and providers. *See Howell v. Hamilton Meat & Provisions*, 257 P.3d 1130, 1138–39 (Cal. 2011). A prearranged, yet conditional, forgiveness of debt is still forgiveness of debt, and write-downs are conditional upon payment by a particular third-party payor. If an insurer ultimately rejects coverage for any reason, or if payment by the

insurer is otherwise frustrated after treatment, the provider can, and presumably will, still charge the full rate to the patient. Even if there is a preexisting arrangement for a write-down, the write-down does not actually take effect until payment by the insurer is accepted by the provider, i.e., *after* treatment has been rendered, which is when the patient's duty to pay for it is incurred. Providers will not typically provide treatment until a patient signs a "financial responsibility" document whereby the patient agrees to pay the full price himself if the insurer ultimately rejects coverage.

      The *Howell* Court's ruling that "if the plaintiff negotiates a discount and thereby receives services for less than might reasonably be charged, the plaintiff has not suffered a pecuniary loss or other detriment in the greater amount and therefore cannot recover damages for that amount," *id.* at 1138, applies with equal force to the collateral source rule generally, yet the *Howell* Court appears to have left the collateral source rule intact as to direct third-party payments. The result is schizophrenic, because in neither case—third-party payment of a debt or third-party forgiveness of the same debt—does the plaintiff actually incur any economic loss beyond the amount he is actually made to pay out of his pocket. The *Howell* case is therefore squarely at odds with the collateral source rule, which utterly disregards the amount of money a tort victim is actually made to pay to remedy his injuries, in favor of awarding the reasonable cost of ameliorating the injuries, notwithstanding any potential "double recovery" by the tort victim. The Court will not predict that the Nevada Supreme Court would adopt such an incoherent rule. The dissenting opinion of Judge Klein in the *Howell* case accurately reflects both the reasoned view of this Court and, more importantly, this Court's prediction of the way the Nevada Supreme Court would address the issue. *See generally id.* (Klein, J., dissenting). That is, Plaintiff may recover the *reasonable* value of his treatment, and no more, without regard to whether the amount he paid out of his pocket directly in order to obtain that treatment was reduced by a third-party payor *or* a third-party payee. *See id.* at 1147–48 (Klein, J., dissenting); *Klinke*, 286 P.3d at

598 (Gibbons, J., concurring) ("Evidence of payments showing write-downs is irrelevant to a jury's determination of the reasonable value of the medical services and will likely lead to jury confusion."). This is in fact the majority rule. *Klinke*, 286 P.3d at 599 (Gibbons, J., concurring) (collecting cases); *see also* Restatement (Second) of Torts § 920A cmt. c, subsec. (3) (1979) ("Thus the fact that the doctor did not charge for his services or the plaintiff was treated in a veterans hospital does not prevent his recovery for the reasonable value of the services."). And it is for Defendant to show that Plaintiff's medical bills were unreasonable in-and-of-themselves under the affirmative defense of mitigation of damages.

The collateral source rule has always been controversial, but it is not for this Court to create exceptions to it, and the Court estimates that the Nevada Supreme Court would not create an exception here, anyway. Defendant may attempt to prove at trial that the amounts billed by Plaintiff's medical providers were unreasonable in-and-of-themselves—assuming Defendant has experts to provide such testimony—but Defendant may not under the collateral source rule argue that any amount written down is necessarily unreasonable by the very fact that the amount was written down. Again, the rule recognizes that a tort victim may receive a "windfall," but that windfall belongs to the victim, not to the tortfeasor. The Court simply cannot find a convincing rationale to exclude evidence of the partial satisfaction of a tort victim's tort-related bills by a third-party *payor* but not to exclude evidence of the partial satisfaction of the very same bills by a third-party *payee*. In both cases, a tort victim has remedied his harm at a bargain rate yet stands to recover damages from the tortfeasor at full price.

The policy of encouraging people to purchase automobile insurance does not make it more important to apply the collateral source rule in cases of third-party payment than in cases of third-party forgiveness. The "encouragement" rationale is itself weak. The average person's fear of criminal liability for driving without insurance surely overshadows any concerns about the collateral source rule, a rule about which the vast majority of people, and even many lawyers, are

totally unaware.  Certainly the rule *benefits* those who have insurance, but it can only *encourage* people to buy insurance if they know about the rule, and it is probably not the case that any meaningful percentage of laymen are aware of the collateral source rule.  And although California's cases sometimes state that the rule encourages the purchase of insurance, *see, e.g.*, *Helfend v. S. Cal. Rapid Transit Dist.*, 465 P.2d 61, 66 (Cal. 1970) (stating without citation that "[t]he collateral source rule expresses a policy judgment in favor of encouraging citizens to purchase and maintain insurance"), it is far from clear that any such rationale underlies the rule, *see, e.g.*, *Loggie v. Interstate Transit Co.*, 291 P. 618, 619–20 (Cal. Ct. App. 1930) (citing *Clark v. Burns Hammam Baths*, 236 P. 152 (Cal. Ct. App. 1925)) (noting that the rule arises out of the simple fact that a tortfeasor must pay for the harm he causes, and that no separate relationship between his victim and an insurance company has anything to do with the matter).  The encouragement rationale appears to have been applied as supplemental support for the rule in the late Twentieth Century long after the rule's genesis in the early Twentieth Century under the irrelevancy rationale.  But even assuming, *arguendo*, that the encouragement rationale is the primary force behind the collateral source rule, and even if we were to entertain the fantasy that the average person is aware of these kinds of legal obscura and orders his life around them, the inclusion of write-downs within the rule serves to encourage the purchase of insurance just as the third-party payment rule itself supposedly does, because third-party forgiveness in the form of write-downs (like third-party payments) do not typically occur except where the tort victim is insured.

It is not entirely clear what type of insurance coverage—automobile insurance or health insurance—the collateral source rule is typically presumed to encourage.  But if we entertain the notion that the rule in fact encourages the purchase of insurance wherever coverage would be beneficial under the rule, then we must assume it encourages the purchase of *both* kinds of insurance.  The rule encourages the purchase of uninsured and underinsured motorist ("UIM")

coverage and medical bills coverage by potential tort victims,[1] because one can then rest assured that one's UIM and medical bills coverage will not be used to reduce one's recovery in tort.[2] The rule likewise encourages the purchase of health insurance, because one can then rest assured that one's health insurance coverage will not be used to reduce one's recovery in tort. Modern health insurance plans, however, are incredibly complex. The direct payments health insurers make to medical providers are only part of the benefits they provide to their insureds. Write-downs are another benefit for which insureds pay consideration (via premiums) that can be just as valuable as direct payments. *See Klinke*, 286 P.3d at 598 (Gibbons, J., concurring) (citing *Acuar v. Letourneau*, 531 S.E.2d 316, 322 (Va. 2000)).[3] Medical providers offer write-downs to health

---

[1] Except where UIM coverage is not available unless one also purchases liability insurance, the rule neither encourages nor discourages the purchase of liability insurance, because payment of a tort victim's bills by the tortfeasor's insurance company is legally equivalent to payment by the tortfeasor himself, i.e., it is a *second*-party payment, not a third-party payment within the collateral source rule, and a tort victim's own liability insurance is not implicated at all.

[2] This is true at least where an insurer cannot be subrogated to medical damages, such as in Nevada. *See Maxwell v. Allstate Ins. Cos.*, 728 P.2d 812, 814–15 (Nev. 1986).

[3] The *Howell* Court reasoned that the fact that these kinds of write-downs arise out of negotiated, commercial considerations mitigates *against* applying the collateral source rule, because the write-downs are not pure gratuities that implicate § 920A of the Second Restatement. *See Howell*, 257 P.3d at 1139–40. But the reasoning that write-downs should not be included within the collateral source rule precisely because they arise out of economic considerations is odd in light of the fact that the *Howell* Court did not take issue with the long-accepted notion in the California courts that the economic-incentive-to-the-tort-victim theory drives the collateral source rule generally. The Restatement's inclusion of pure gifts within the rule is an *additional* inclusion driven by the windfall theory, but there is no reason to abandon the economic incentive rationale wherever there has been any benefit to the tort victim resembling a gift but not literally constituting one. In such a case, the rule suggested in § 920A may not by implicated, but a court that wishes to further the purposes behind the collateral source rule should still examine whether a tort victim who has purchased insurance is benefitted by that fact via the application of the rule in a new context.

Perhaps the *Howell* Court simply failed or refused to recognize that an insured benefits from write-downs in exchange for his insurance premium payments. That is, write-downs are not an insulated insurer–provider transaction but are inextricably linked to the economic benefit an insured receives from his insurance contract. Write-downs exist because of preferred provider

insurance companies who use them as preferred providers. Write-down agreements are in essence bulk pricing plans. An insured's premium payments are not only for the benefit of direct payments to providers but for all the benefits the plan provides, and those benefits include written-down costs by preferred providers. The insured has provided consideration for the value of the written down costs by paying his health insurance premiums and choosing a preferred provider, just as the insured has provided consideration for the value of direct payments by the insurer. Indeed, a third-party payment by a health insurance company and a third-party write-down by a provider will typically occur in conjunction with one another such that the third-party payment and the write-down are inextricably linked, i.e., the provider agrees to write down the cost based upon the insurer making the payment. The rule applies here as to both payments by the third-party insurer and forgiveness by the third-party provider in the form of write-downs negotiated with the third-party insurer in a way inextricably linked to the insured's benefits under

---

agreements between insurers and providers, which in turn only exist because of the contractual relationships between insurers and insureds.

Or perhaps the *Howell* Court's conclusion arises primarily out of its frustration with the market for medical care, i.e., the fact that rates for care fluctuate wildly based upon the identity of the payor and are driven by a mishmash of disjointed, dysfunctional, or unseemly considerations. *See id.* at 1141–42. But a court's discomfort with the difficulties in calculating a market value for medical damages apart from the amount actually paid (because of the complexities inherent in modern medical billing) is no reason to take from a plaintiff or a defendant the ability to argue to the jury the amount of damages actually caused, and in federal court, anyway, the *Howell* Court's resolution of the issue is simply not permitted. *See* U.S. Const. amend. VII. Plaintiffs have a federal constitutional right to argue their damages to a jury, and defendants have a similar right to argue against those damages, notwithstanding any judge's concerns that proving or calculating damages may be difficult for the parties and the jury, respectively, as a practical matter. The Seventh Amendment limits a judge's role to ensuring that any jury verdict is supported by the evidence and giving the Plaintiff a choice between a new trial and a verdict reduced to an amount supported by the evidence. *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 914–15 (2nd Cir. 1997). The fact that medical billing rates vary so widely simply broadens the scope of a permissible jury verdict measured by "market value." Surely the issue is not more complex than a calculation of *non*-economic damages, which by their nature have no "accurate" value but awards of which are routinely permitted under various theories of calculation. Courts themselves also routinely determine the reasonable value of attorney's fees, which also have no fixed, "correct" value.

his policy.

### 2. Miscellaneous Requests for Exclusion

Defendant asks the Court to exclude evidence of or remarks concerning Defendant's financial condition. Plaintiff does not object. The Court grants the motion in this regard. Punitive damages are no longer available in this case, and punitive damages was the only issue in the case to which Defendant's financial condition would have been relevant. *See* Fed. R. Evid. 401, 402.

Defendant asks the Court to prevent counsel for Plaintiff from mentioning or publishing evidence to the jury before giving counsel for Defendant the opportunity to inspect it. Plaintiff does not object. The Court grants the motion in this regard. No rule requires the practice, but the parties appear to have agreed to it. Counsel is aware of the rules preventing publication of evidence to the jury before it has been admitted and preventing the mention of evidence during opening statements or closing arguments that will not be or has not been presented at trial.

Defendant asks the Court to exclude evidence of its liability insurance because ownership and control of the premises is not disputed. Plaintiff does not object. The Court grants the motion in this regard. *See* Fed. R. Evid. 411.

Defendant asks the Court to exclude witnesses from the Courtroom until they are called to testify, except for Plaintiff and Defendant's trial representative. The Court grants the motion in this regard. *See* Fed. R. Evid. 615. Plaintiff argues only that the rule should not apply to expert witnesses because its purpose is to preclude "fact witnesses" from shaping their testimony based upon the testimony of other witnesses. The rule includes several exceptions, none of which are for expert witnesses, and the purpose behind the rule applies equally to expert witnesses, who may also shape their testimony based upon what they hear before they testify. Simply because expert witnesses may base their opinions upon things heard in the courtroom does not mean they are always immune from exclusion before testifying under Rule 615. Expert witnesses are

excluded under Rule 615 only if their presence before testifying is essential to the party's case, i.e., when they must be present to base their opinion upon the facts heard from other witnesses. *See* Fed. R. Evid. 615(c); *Opus 3 Ltd. v. Heritage Park, Inc.*, 91 F.3d 625, 629 (4th Cir. 1996) ("In the case before us, even if [the expert] were going to testify only as an expert, Heritage Park failed to establish that he needed to hear the trial testimony of the other witnesses in order to render his opinions. [The expert] had received and reviewed all of Opus 3's records, including its expert's records of the cost of services rendered, and had prepared a written analysis well before trial."). The same is true here.

Defendant asks the Court to exclude any evidence of subsequent remedial measures pertaining to Plaintiff's alleged fall. The Court grants the motion in this regard. *See* Fed. R. Evid. 407. Plaintiff objects that evidence of remedial measures will be admissible under the feasibility or impeachment exceptions if Wal-Mart "argues that any subsequent measures were either unnecessary or merely a precautionary measure." But Wal-Mart will not have to argue this, because evidence of subsequent remedial measures will not be admitted in the first instance, so Wal-Mart will not have to attempt to explain away why it may have taken any such measures. Of course, if Wal-Mart "opens the door" by arguing or eliciting testimony concerning the alleged infeasibility of precautionary measures, the analysis will change, but the Court is not yet facing those circumstances, and it is unlikely to occur at trial.

Defendant asks the Court to exclude any mention of where counsel resides or practices as irrelevant. Plaintiff does not object. The Court grants the motion in this regard. *See* Fed. R. Evid. 401, 402.

Defendant asks the Court to exclude evidence from other incidents with no factual nexus to the present case. Plaintiff does not object. The Court grants the motion in this regard. *See* Fed. R. Evid. 401, 402, 404(b).

Defendant asks the Court to exclude evidence of settlement negotiations and factual

statements made therein.  Plaintiff does not object.  The Court grants the motion in this regard. *See* Fed. R. Evid. 408.

Defendant asks the Court to exclude the portions of Plaintiff's medical records containing hearsay.  The Court grants the motion in part in this regard.  Medical records themselves are potentially admissible under the business records exception. *See* Fed. R. Evid. 803(6).  The doctor's statements therein are therefore not hearsay under Rule 803(6) so long as he made the statements under a business duty.  The statements of others recorded within such records are still hearsay if not separately excluded or excused, i.e., they are double-hearsay.  Plaintiff's statements to his doctor made for the purpose of treatment are not hearsay. *See* Fed. R. Evid. 803(4).  This includes statements concerning the manner of Plaintiff's fall, e.g., "I slipped on wet concrete and fell flat onto my right side" or "I couldn't move my right leg for thirty seconds."  However, any statements of fault or fact that were not necessary for medical treatment are hearsay and are not admissible, e.g., "there were no warning signs" or "an employee had just mopped the floor."

Defendant asks the Court to exclude an allegedly prejudicial statement, i.e., the deposition testimony of Jesus Flores that "humid" means "slightly wet."  Defendant argues that Plaintiff's counsel badgered the witness into making this comparison.  The Court denies the motion in this regard.  Plaintiff adduces the full exchange in his opposition, and it appears that counsel only asked the witness if the floor was "slightly wet" after the witness said it was "humid."  It was reasonable for counsel to ask the witness to admit that a "humid" surface was a "slightly wet" surface, because it makes no sense for a solid surface to be "humid," as the witness had first described the floor.  The English word "humid" refers to high levels of water vapor in the air.  The English word "wet" refers to liquid water on a solid surface.  It was clear the witness was conflating humidity with spilled water or condensation when he initially testified, "To me, humid is [sic] water falls, you dry it up, and the floor remains wet."  It may also be that the witness is a native Spanish speaker, and the Spanish word "humedo" can mean either "humid" or

"wet." Defendant had the opportunity to examine the witness, and Defendant will have the opportunity to examine or cross-examine any witness at trial who will introduce this deposition testimony to give the jury the context of the exchange.

Defendant asks the Court to exclude the testimony of Dan Holland because he was not timely disclosed as a witness in Plaintiff's initial disclosure or any of his eight supplemental disclosures. The Court denies the motion in this regard. *See* Fed. R. Evid. 37(c)(1). Plaintiff argues that Defendant has had actual knowledge of Mr. Holland and his expected testimony and that there has been no harm to Defendant from any failure to formally disclose him. Plaintiff notes that it disclosed "A Member of Management of Wal-Mart Store #2884" and that Mr. Holland's deposition was taken eight months before trial. The Court finds that Plaintiff has not shown that it formally disclosed Mr. Holland as a witness by name, address, and telephone number. Plaintiff has, however, satisfied his burden of showing harmlessness or substantial justification. Defendant should have anticipated the store manager on duty during the incident would be called as a witness at trial, especially in light of the deposition and the relevant testimony given during that deposition.

Defendant asks the Court to exclude any mention of alleged surveillance footage. Defendant argues that there is no such footage and that Plaintiff has never sought it through discovery. The Court grants the motion in part in this regard. Plaintiff may not refer to footage as if it exists unless he will produce it. He may ask witnesses if they have any knowledge of surveillance footage of the incident if he has a good faith belief that there may have been some and that the witness knows of it or saw it. Specifically, he may ask Mr. Holland about the existence or non-existence of any video footage of the incident and related questions within the scope of Mr. Holland's direct knowledge. The Court will wait until it has heard the relevant testimony at trial before determining whether to issue an adverse inference instruction.

Defendant asks the Court to exclude the testimony of Mary Soto in three respects. It asks

the Court to exclude any testimony concerning whether Soto's post-incident investigation violated Wal-Mart's procedures. The Court grants the motion in this regard. *See* Fed. R. Evid. 401, 402. The answers to those questions would not be relevant to any issue in the case. However, Plaintiff may ask questions regarding what Soto learned of the incident (if otherwise admissible), how she treated any evidence, etc.

Defendant also asks the Court to exclude any testimony concerning Soto's opinions concerning the cause of Plaintiff's alleged fall because she has no first-hand knowledge of the fall and she is not an expert. The Court grants the motion in part in this regard. Soto may testify as to her lay opinion of the cause of the fall if she witnessed it. Such an opinion is within the experience of a lay person. If she did not witness the fall, she may still testify as to facts of which she has direct knowledge, such as whether she noticed a slippery substance on the floor immediately after the fall, whether she knew if the area was roped off, etc.

Finally, Defendant asks the Court to exclude testimony concerning the impact of customer incidents on employee bonuses. The Court grants the motion in part in this regard. This evidence would more prejudicial than probative considered in a vacuum, but it might be relevant if offered for impeachment of an employee as to bias or motive to lie.

## CONCLUSION

IT IS HEREBY ORDERED that the Motions in Limine (ECF Nos. 47, 48) are GRANTED IN PART and DENIED IN PART.

IT IS SO ORDERED.

Dated this 4th day of February, 2014.

_____
ROBERT C. JONES
United States District Judge